The MEAD CORPORATION, Petitioner,

v.

Carol M. BROWNER, Administrator, and the United States Environmental Protection Agency, Respondents.

No. 95–1610.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 21, 1996.

Decided Nov. 12, 1996.

J. Van Carson, Cleveland, OH, argued the cause, for petitioner. With him on the briefs, were Wendlene M. Lavey, Cleveland, OH, and Susan Kerr Lee, Chattanooga, TN.

Alan H. Carpien, Attorney, Environmental Protection Agency, argued the cause, for respondents. With him on the brief, were Lois J. Schiffer, Assistant Attorney General, U.S. Department of Justice, and S. Randall Humm, Attorney, Washington, DC, Environmental Protection Agency.

Before: WILLIAMS, HENDERSON and RANDOLPH, Circuit Judges

Opinion for the Court filed by Circuit Judge WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

The Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601–9675, authorizes the Environmental Protection Agency[1] to establish a National Priorities List ("NPL"), identifying high priorities among the nation's known hazardous waste sites. The statute directs EPA to base the listing criteria on "relative risk or danger to public health or welfare or the environment." *Id.* § 9605(a)(8)(A). In preparing the list, EPA

is to apply the criteria thus established, and also to accommodate state preferences by including one facility designated by each state among its top 100 priorities. *Id.* § 9605(a)(8)(B). The EPA has duly promulgated risk-based criteria under which a listing is triggered by either a high score on its Hazard Ranking System ("HRS") or by a "health advisory." 40 C.F.R. § 300.425(c). Here, relying on the latter, it has listed three areas as a single site. But one of the three areas—the "Coke Plant Site"—is over a mile away from the rest of the aggregate site. EPA makes no claim either that the Coke Plant Site qualifies for listing under the agency's risk-based criteria or that it has received state designation. Rather, EPA includes the Coke Plant Site only by virtue of its "Aggregation Policy," see Amendment to National Oil and Hazardous Substances Contingency Plan; National Priorities List, 48 Fed.Reg. 40,658, 40,663/3–64/1 (Sept. 8, 1983) ("Aggregation Policy"); see also Hazardous Waste Management System; Identification and Listing of Hazardous Wastes, 49 Fed. Reg. 37,070, 37,076/1–2 (Sept. 21, 1984), which sets forth various factors permitting aggregation of noncontiguous parcels as a single NPL site. The factors named in the Aggregation Policy bear only the dimmest relation to any idea of risk. Mead Corporation, a former owner of the Coke Plant Site, challenges the site's listing. Because EPA cannot lawfully use the Aggregation Policy to list a site that does not qualify under its statutorily warranted criteria, we grant Mead's petition for review.

\*   \*   \*

The aggregated site, the "Tennessee Products Site," consists of three distinct areas in Chattanooga, Tennessee. The first, the "Creek Site," is a 2.5–mile section of the Chattanooga Creek that has been contaminated by coal-tar wastes dumped into the creek and onto the floodplain near the creek during the 1940s and '50s. National Priorities List for Uncontrolled Hazardous Waste Sites, Proposed Rule No. 16, 59 Fed.Reg.

---

**1.** Technically the delegation is to the President, who has subdelegated the authority to the EPA. Exec. Order No. 12,316, 46 Fed.Reg. 42,237 (1981); Exec. Order No. 12,580, 52 Fed.Reg. 2923 (1987).

2568, 2573/2–3 (Jan. 18, 1994) ("Proposed Rule"). According to the EPA, an increase in production while the U.S. Government owned and operated the coke plant during World War II caused a large increase in waste, which in turn "may have strained" the previously established waste handling procedures. *Id.* at 2573/3.

The Creek Site has been listed according to one of the three criteria set forth by EPA pursuant to CERCLA, involving the issuance of a "health advisory" by the Agency for Toxic Substances and Disease Registry ("ATSDR"). EPA adopted this criterion because it decided that its more commonly used risk-based scoring system, the Hazard Ranking System, failed to account for certain risks arising out of direct contact with hazardous substances, and from fire and explosion. Amendment to National Oil and Hazardous Substance Contingency Plan; National Priorities List, 48 Fed.Reg. 40,674, 40,676/1 (Sept. 8, 1983). Under the health advisory criterion, the EPA lists sites for which:

> (i) The Agency for Toxic Substances and Disease Registry has issued a health advisory that recommends dissociation of individuals from the release;

> (ii) EPA determines that the release poses a significant threat to public health; and

> (iii) EPA anticipates that it will be more cost-effective to use its remedial authority than to use removal authority to respond to the release.[2]

40 C.F.R. § 300.425(c)(3). Mead does not dispute this listing, nor that of the second component of the aggregate site, the "Dump Site," which is adjacent to the creek and of which Mead was never an owner.

The third component, the "Coke Plant Site," is located approximately one mile from the creek. The coke plant made tar products, coke, light oils and coal tar from the start of its operations in 1918 until its shutdown in 1987. Mead (or a predecessor corporation) owned the plant for ten of its 69 years of operational history, from 1964 to 1974. The property is currently owned by Hamilton County and the City of Chattanooga.

EPA found that the tar deposits contaminating the creek "in all likelihood" came from operations at the coke plant, see EPA, "Aggregation of the Tennessee Products Site (TND071515959)," June 8, 1993, Joint Appendix at 61, 66, also finding that the majority "were likely" deposited in the period 1926–64, i.e., before Mead's ownership, *id.* There is no evidence that the coke plant continues to contaminate the Creek Site. Although there was once a private sewer line that discharged into the creek, Mead states that the line was abandoned in 1948. Thus, the only relationship between the plant and the creek is history, and, at that, a history that links Mead to the contamination either marginally or not at all.

On August 20, 1993 the ATSDR issued a public health advisory. Although titled the "Tennessee Products Site," the advisory makes clear—and there is no dispute—that it applies only to the Creek Site, not to the Coke Plant Site. The ATSDR supported issuance of the health advisory with evidence that access to the creek was unrestricted and that therefore residents could come into contact with contaminants by swimming or fishing in the creek. In contrast, the Coke Plant Site has been secured and is not accessible to the public.

▮▮▮ Admitting that it has not produced evidence to list the Coke Plant Site either because of an ATSDR advisory or an HRS ranking, or any designation by Tennessee, EPA rests the listing of the Coke Plant Site entirely on its Aggregation Policy. That policy calls for listing noncontiguous facilities on the basis of such factors as whether the two areas were part of the same operation, whether the potentially responsible parties ("PRPs") are the same or similar, whether the target population is the same or overlapping, and the distance between the noncontiguous areas. Aggregation Policy, 48 Fed.Reg. at 40,663/3; see also 49 Fed.Reg. at 37,076/1. Mead contends that even if the

---

2. Removal action involves cleanup or removal. Remedial actions are those other than removal actions that are designed to prevent or minimize releases so that they do not migrate or cause substantial danger by methods such as storage or containment. 42 U.S.C. § 9601(23) & (24).

Aggregation Policy were a lawful basis for listing, the Coke Plant Site does not truly satisfy it. We resolve the issue on the basis of its other claim, however, one that we did not reach in *Linemaster Switch Corp. v. EPA,* 938 F.2d 1299, 1308 (D.C.Cir.1991), because the petitioner had failed to raise it before the agency: namely, that the policy— as used to justify the listing of noncontiguous sites whose listing cannot be individually justified by reference to EPA's risk or state designation criteria—is unlawful.

\* \* \*

Although not arguing that Mead lacks standing to challenge the listing, EPA suggests that we ought not worry about its decision because the NPL is merely a planning tool with "no effect on [Mead's] liability under CERCLA." Respondent's Brief at 20. This circuit has clearly recognized the harmful effects of being linked to a site placed on the NPL. *Bd. of Regents of Univ. of Wash. v. EPA,* 86 F.3d 1214, 1217 (D.C.Cir.1996); see also *Kent County, Delaware Levy Court v. EPA,* 963 F.2d 391, 394 (D.C.Cir.1992) (damage to business reputation, loss of property value and other considerable costs). Listing of the Tennessee Products Site brings Mead within the web of Superfund's cleanup and enforcement scheme. Although EPA does not necessarily initiate cleanup action just because a site is listed, and although the lack of NPL listing does not prevent EPA from taking enforcement action, 40 C.F.R. § 300.425(b)(2) & (4), listing drastically increases the chances of costly activity. EPA stated in this very proceeding that it limits enforcement actions to NPL-listed sites:

> EPA may take enforcement actions under CERCLA ... regardless of whether the site is on the NPL, although, as a practical matter, the focus of EPA's CERCLA enforcement actions has been and will continue to be on NPL sites.

Proposed Rule, 59 Fed.Reg. at 2570/3. In addition, sites placed on the NPL become eligible for funds from the Superfund for remedial action on the site. 40 C.F.R. § 300.425(b)(1). While the availability of these funds might be seen as only benefitting PRPs, once EPA has funds to clean up a site, it gains bargaining leverage over parties such as Mead. EPA could, for example, propose an expensive remedial operation at the Coke Plant Site (for which Mead's status as a former owner would provide a plausible basis for a claim that it was a PRP, see CERCLA § 107(a)(2), 42 U.S.C. § 9607(a)(2) (reaching owner or operator of a facility at a time of disposal of hazardous substances)), and use that threat to pressure Mead to contribute towards cleaning up the creek. Mead's standing is ample.

In promulgation of the Aggregation Policy and in its brief, EPA has claimed support from CERCLA § 104(d)(4), which provides:

> (4) Where two or more noncontiguous facilities are reasonably related on the basis of geography, or on the basis of the threat, or potential threat to the public health or welfare or the environment, the [EPA] may, in [its] discretion, treat these related facilities as one *for purposes of this section.*

CERCLA § 104(d)(4), 42 U.S.C. § 9604(d)(4) (1988) (emphasis added); see also Aggregation Policy, 48 Fed.Reg. at 40,663/3 (asserting support from § 104(d)(4)). But § 104 is not the section authorizing creation of the NPL. Its role is to permit EPA to engage in remedial and removal actions. *Id.* § 9604(a)(1). As § 104(d)(4) explicitly creates aggregation authority solely "for purposes of this section," i.e., § 104, it doesn't help EPA in the exercise of its listing authority under § 105. And it seems quite understandable that Congress would supply broad flexibility for common *treatment* of sites, without giving EPA any comparable discretion to list low-risk sites as if they were high-risk ones.

EPA further relies on the last sentence of § 105(a)(8)(B): "Other *priority* facilities or incidents may be listed singly or grouped for response priority purposes." 42 U.S.C. § 9605(a)(8)(B) (emphasis added). This follows two sentences stating special rules for "highest priority" facilities—first that they be listed individually to "the extent practicable," and second that each state "shall be allowed to designate its highest priority facility only once." *Id.* Presumably the purpose of the requirements is to protect the top

priority portion of the NPL from site proliferation. In any event, assuming the sentence on "[o]ther priority facilities" allows the aggregation of noncontiguous sites for NPL listings, it clearly allows such grouping only for "*priority* facilities." Thus it provides no authority for listing a site on criteria other than those specified by statute—namely either state designation or the purely risk-related criteria that EPA has formulated in terms of a high HRS score or a health advisory.

Alternatively, EPA argues that Congress has been "silent or ambiguous" on the issue of aggregation under § 105, so that we should defer to EPA's construction of the statute if it is reasonable. *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). But even if we read § 105 as silent on the issue of grouping a priority site with a non-priority one as a single priority site, EPA's Aggregation Policy would be unreasonable as applied here. Permitting the inclusion of low-risk sites on the NPL would thwart rather than advance Congress's purpose of creating a priority list based on evidence of high risk levels.

In fact, as we noted in *Linemaster Switch Corp.,* when Congress detected that EPA's "1982 HRS resulted in the listing of a disproportionate number of high volume, low toxicity hazardous waste sites," 938 F.2d at 1303, it stepped in with the Superfund Amendments and Reauthorization Act of 1986 and required EPA to amend the HRS to make sure that it "accurately assesses the relative degree of risk to human health and the environment posed by sites and facilities subject to review." CERCLA § 105(c)(1), 42 U.S.C. § 9605(c)(1). The idea that Congress implicitly allowed EPA broad discretion to lump low-risk sites together with high-risk sites, and thereby to transform the one into the other, is anything but reasonable.

Section 105(a)(8)(A) provides a lengthy list of appropriate factors:

the population at risk, the hazard potential ..., the potential for contamination of drinking water supplies, the potential for direct human contact, the potential for destruction of sensitive ecosystems, the damage to natural resources which may affect the human food chain ..., the contamination or potential contamination of the ambient air ..., State preparedness to assume State costs and responsibilities, and other appropriate factors.

§ 9605(a)(8)(A). EPA does not argue that its Aggregation Policy should be upheld under the closing reference to "other appropriate factors," and we doubt that a factor would be "appropriate" when, by its terms, it causes the listing of low-risk sites. With the exception of the "state preparedness" factor, which relates to state obligations under § 104(c)(3), 42 U.S.C. § 9604(c)(3), all of the factors specified by Congress address the level of risk. In contrast, those of the Aggregation Policy, such as whether the two areas were part of the same operation or have the same PRPs, do not—except by coincidence. Such a use of the catchall phrase at the end of § 105(a)(8)(A) would make a hash of Congress's intended prioritization.

Finally, EPA claims that the Aggregation Policy is of a piece with policies that we have previously upheld—policies declaring that it need not specify precise geographic boundaries in designating NPL sites, and that it can enlarge initial boundaries if additional study reveals a wider scope of contamination. See *Washington State Dep't of Transp. v. EPA,* 917 F.2d 1309, 1311 (D.C.Cir.1990); *Eagle–Picher Indus. v. EPA,* 822 F.2d 132, 144 n. 59 (D.C.Cir.1987). But it is ·hard to see how our sustaining expansion of initial boundaries to reflect evidence of wider-than-expected contamination is any basis for sustaining extension of a site to include regions where the contamination fails to meet EPA's thresholds. And, while *Eagle–Picher* also approved inclusion of areas that EPA had not specifically sampled, on the basis of samples from adjacent areas, it did so merely as an application of the principle that where the circumstances make it reasonable to draw inferences from a sample, the agency may do so. *Id.* at 141–42. See also *Washington State Dep't of Transp.,* 917 F.2d at 1311–12 n. 6; cf. *Dithiocarbamate Task Force v. EPA,* 98 F.3d 1394, 1399–1400, 1402–03 (D.C.Cir.1996).

Because EPA lacks statutory authority to use its Aggregation Policy to list on the NPL a site that would not otherwise qualify, we vacate EPA's inclusion of the Coke Plant Site within its Tennessee Products Site listing.

*So ordered.*