132 F.3d 90

**MONTROSE CHEMICAL CORPORATION OF CALIFORNIA, Petitioner,**

v.

**ENVIRONMENTAL PROTECTION AGENCY, Respondent.**

**Nos. 96–1334, 96–1341, 96–1350, 96–1355, and 96–1371.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 7, 1997.

Decided Jan. 13, 1998.

Karl S. Lytz, San Francisco, CA, argued the cause for petitioners, with whom Paul B. Galvani, Boston, MA, Frank Rothman, Jose R. Allen, Charles B. Cohler and Jeffrey F. Silverman, San Francisco, CA, were on the joint briefs. David M. Rosenberg–Wohl, San Francisco, CA, entered an appearance.

H. Michael Semler, Attorney, U.S. Department of Justice, Washington, DC, argued the cause for respondent, with whom Lois J. Schiffer, Assistant Attorney General, Washington, DC, and Alan Carpien, Attorney, Environmental Protection Agency, were on the brief.

Before: GINSBURG, SENTELLE and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

ROGERS, Circuit Judge:

The issue presented is whether two internal memoranda of the Environmental Protection Agency ("EPA") constitute a regulation reviewable by this court under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). Under CERCLA, EPA must maintain and revise annually the National Priorities List ("NPL") of hazardous waste sites most in need of long-term remedial attention, *see* 42 U.S.C. § 9605(a)(8)(B) (1988); 40 C.F.R. § 300.5 (1996), but can change the list only through notice-and-comment rulemaking. *See* 42 U.S.C. § 9605(a). In two July 1996 memoranda, EPA announced that it would manage response activities at a preexisting NPL site, the Montrose Chemical National Priorities List Superfund Site ("Montrose NPL Site"), in conjunction with an investigation and response activities at a separate unlisted offshore area, the Palos Verdes Shelf ("the Shelf"). Petitioners contend that this decision constitutes a regulation amending the NPL, without the required notice-and-comment procedures, and request the court to vacate those memoranda and to order the agency to cease taking actions inconsistent with CERCLA's rulemaking procedures. While conceding that these memoranda could not validly amend the NPL, EPA maintains that it never sought to amend the NPL or engage in rulemaking and, thus, this court is without jurisdiction to review the memoranda under CERCLA. *See id.* § 9613(a), (h) (1988). We agree with both parties that the memoranda could have no effect on the NPL, and with the agency that the memoranda do not constitute a regulation amending the NPL; hence, we dismiss the petitions for lack of jurisdiction.

### I.

Our consideration of the petitions for review focuses on three sections of CERCLA: sections 104, 105, and 113. Section 105 establishes the list of the national priorities for hazardous waste remedial actions. *See* 42 U.S.C. § 9605(a)(8)(B); *see also* 40 C.F.R. §§ 300.5, .425(b) (1996). The sites on the list are presumed to be those most in need of remedial attention, and "listing drastically increases the chances of costly activity" and liability for the potentially responsible parties. *Mead Corp. v. Browner*, 100 F.3d 152,

155 (D.C.Cir.1996). Consequently, under section 105, EPA can add a site to the NPL only after providing interested parties notice and an opportunity for comment. *See* 42 U.S.C. § 9605(a).

At the same time, the actual substantive impact, as distinct from practical impact,[1] of listing is limited. EPA is under no obligation to take actions with regard to listed sites, *see* 40 C.F.R. § 300.425(b)(2); *Mead,* 100 F.3d at 155, and section 104 of CERCLA makes clear that EPA may take response actions at hazardous waste sites regardless of whether they are listed on the NPL. *See* 42 U.S.C. § 9604(a)(1) (1988). EPA can always take response actions that neither demand more than $2 million from the Superfund[2] nor last longer than one year at either listed or unlisted sites. *See id.* § 9604(c)(1); 40 C.F.R. §§ 300.415(b)(5), .425(b)(1).[3] The limited substantive importance of listing is further underscored by section 104(d)(4) of CERCLA, which provides that regardless of NPL status, "[w]here two or more noncontiguous [hazardous waste sites] are reasonably related on the basis of geography, or on the basis of the threat, or potential threat to the public health or welfare or the environment, the President may, in his discretion, treat these related facilities as one for purposes of [section 104]." 42 U.S.C. § 9604(d)(4); *see also id.* § 9601(9) (1988). Although this provision does not empower EPA[4] to expand preexisting NPL sites without satisfying CERCLA's procedural and substantive requirements for listing new sites, *see Mead,* 100 F.3d at 155, section 104(d) authorizes the agency to take response actions with regard to unlisted sites that are "reasonably related" to listed ones, within the $2 million and one year limits.

■ Section 113(a) of CERCLA governs judicial review of listing decisions, authorizing review of "any regulation" promulgated under CERCLA. 42 U.S.C. § 9613(a). The listing of a site on the NPL constitutes promulgation of a regulation subject to judicial review under this provision. *See Washington State Dep't of Transp. v. EPA,* 917 F.2d 1309, 1311 (D.C.Cir.1990). By contrast, section 113(h) of CERCLA bars judicial review over EPA investigative activities in anticipation of rulemaking, with certain exceptions not relevant here. *See* 42 U.S.C. § 9613(h).

## II.

From 1947 through 1982, the Montrose Chemical Corporation ("Montrose") plant in Torrance, California, manufactured the pesticide dichloro-diphenyl trichloroethane ("DDT"). As a consequence, EPA asserts, large quantities of DDT contaminated the soil, surface water, and groundwater at the plant. EPA also claims that the discharge of DDT into the plant's wastewater resulted in massive contamination at the wastewater's point of release: the Palos Verdes Shelf, a large area of the ocean floor about 1.5 kilometers off the coast of Los Angeles, California. Following an investigation that began in 1982, on October 15, 1984, EPA proposed listing the immediate area of the Montrose plant on the NPL. Although EPA knew of DDT contamination on the Shelf as well as on the plant grounds, the Montrose NPL site

---

**1.** *See Mead,* 100 F.3d at 155; *Board of Regents of Univ. of Wash. v. EPA,* 86 F.3d 1214, 1217 (D.C.Cir.1996).

**2.** The Superfund is the general federal fund for hazardous waste management under CERCLA. *See* 42 U.S.C. § 9611 (1988 & Supp. V 1993).

**3.** There are two kinds of response actions: "removal actions" and "remedial actions." *See* 42 U.S.C. § 9604(a)(1). The category of "removal actions" includes a broad range of monitoring, investigative, and cleanup activities "as may be necessary to prevent, minimize, or mitigate damage," *id.* § 9601(23) (1988), while "remedial actions" are more comprehensive actions that are intended as permanent remedies, *see id.* § 9601(24). EPA can take removal actions with-

out regard to listing, *see* 40 C.F.R. § 300.415(b)(5), but can take remedial actions only at sites on the NPL, *see id.* § 300.425(b)(1). All removal actions other than investigative and monitoring activities are limited to $2 million from the Superfund and one year in length, with exceptions not at issue here, *see* 42 U.S.C. § 9604(c)(1); 40 C.F.R. § 300.415(b)(5), whereas there is no such limitation on the cost or length of remedial actions, *see id.* § 300.425(b)(2). Thus, EPA generally can take response actions (other than investigative and monitoring activities) that cost more than $2 million or take longer than a year only at listed sites.

**4.** The President has delegated his authority under CERCLA to various federal agencies. *See* 40 C.F.R. § 300.100 (1996).

as finalized on October 4, 1989, did not include the Shelf.

In June 1990, the Department of Justice ("the Department") sued Montrose in the United States District Court for the Central District of California. The government brought two claims under section 107(a) of CERCLA, 42 U.S.C. § 9607(a) (1988): first, a claim for natural resource damages caused by the contamination of the Shelf; and second, a claim for reimbursement of the agency's response costs in connection with the Montrose NPL site. *See l ed States v. Montrose Chem. Corp.*, 883 F.Supp. 1396, 1397 (C.D.Cal.1995), *rev'd sub nom. California v. Montrose Chem. Corp.*, 104 F.3d 1507 (9th Cir.1997). The district court dismissed the natural resource damages claim on statute-of-limitations grounds, *see id.* at 1406–07, and the Department appealed.

In an effort to address the statute-of-limitations problem, the Department forwarded to the Ninth Circuit the two internal EPA memoranda that are the focus of the current petitions for review. The Department claimed that these memoranda, which EPA had approved that very day, "expand[ed] the area of EPA response activity with respect to the Montrose [NPL site] to include the Palos Verdes shelf." Further, the Department argued that, if the Shelf was then on the NPL, a different statute of limitations would apply and the district court's ground for dismissal was invalid. *See* 42 U.S.C. § 9613(g)(1); *Montrose Chem. Corp.*, 883 F.Supp. at 1398. The Ninth Circuit did not, however, mention the memoranda in concluding for other reasons that the statute of limitations had not expired, and thus reversing the district court's dismissal of the natural resource damages claim. *See Montrose Chem. Corp.*, 104 F.3d at 1512–14.

The effect, if any, of the memoranda on the NPL is unclear. These two documents, dated July 9, 1996, and approved the next day, were entitled "Engineering Evaluation and Cost Analysis Approval Memorandum for Addressing Contaminated Marine Sediments on the Palos Verdes Shelf" and "Management of EPA Superfund Response Activities as Part of EPA Response Actions Taken in Connection With the Montrose Chemical

NPL Site." In the former, EPA described the contamination on the Shelf and recommended that the agency initiate an engineering evaluation and cost analysis, a study to determine the need for and feasibility of future response actions. In the latter, EPA recommended that the engineering and cost study and other response activities concerning the Shelf be managed "as part of the response activities being conducted by EPA in connection with the Montrose [NPL] Site." The latter memorandum did not specify what joint management would entail, explaining only that: "Management of EPA's response activities with respect to the Palos Verdes shelf contamination as part of EPA's response activities for the Montrose NPL Site will help to facilitate EPA administrative, funding, staffing and enforcement activities."

Although EPA did not explicitly announce an amendment to the NPL in either memorandum, EPA took a number of actions that implied that it thought the Shelf had become part of the Montrose NPL site. In an appendix to the joint management memorandum, EPA called the Shelf the "Palos Verdes Shelf Operable Unit" of the "MONTROSE CHEMICAL CORPORATION SUPERFUND SITE." In a press conference on July 10, 1996, EPA announced that the Montrose NPL site had been expanded to include the Shelf. Although EPA stipulated for the purposes of the district court litigation in California that the Montrose NPL site did not include the Shelf, an internal agency document soon thereafter referred to "EPA's expansion of the Montrose NPL site to include the Palos Verdes Shelf" without questioning that such expansion had occurred. And in an earlier consent decree in the Ninth Circuit litigation, EPA settled response cost claims based on the assumption that the site did include the Shelf.

Many of these references appear inconsistent with EPA's position before this court that it never intended to amend the NPL in its July 1996 memoranda. At oral argument, however, counsel for EPA explained that EPA took the position from 1989 onward that it could consider the Shelf effectively to be part of the Montrose NPL site, and it only began to question that conclusion when this

court decided *Mead Corp. v. Browner* on November 12, 1996. In *Mead*, the court invalidated EPA's "aggregation policy," whereby the agency listed noncontiguous parcels as a single NPL site under certain circumstances even when EPA had not satisfied CERCLA's procedural and substantive requirements for listing as to the individual parcels. *See Mead*, 100 F.3d at 154–57. Thus, EPA maintains that prior to *Mead*, it acted as if the Shelf was part of the Montrose NPL site not because of the two memoranda, but because of its aggregation policy. After *Mead*, the agency continues, it realized that the Shelf could not be part of the site without a separate notice-and-comment rulemaking process, and EPA has accordingly initiated a rulemaking proceeding to add the Shelf to the NPL in accordance with CERCLA's requirements. *See* National Priorities List for Uncontrolled Hazardous Waste Sites, Proposed Rule, 62 Fed.Reg. 44,430, 44,430 (1997).

Notwithstanding EPA's explanations for its actions, the inconsistency of the agency's approach has caused understandable concern among interested parties. Montrose and others[5] petition this court for review of EPA's alleged decision to expand the Montrose NPL site to include the Shelf.

### III.

 Concessions by the parties establish that there is a single dispositive issue before us. If there was a "regulation" within the meaning of section 113(a) of CERCLA, EPA does not dispute that it was improper and invalid.[6] If there was no such regulation, Montrose does not dispute that the court would be without jurisdiction to review any agency action because, to the extent that EPA has not enacted a regulation, its actions are merely response actions over which section 113(h) specifically bars judicial review. *See* 42 U.S.C. § 9613(h). Of course, the court has jurisdiction to determine whether there is jurisdiction to make a ruling on the merits, *see In re Thornburgh*, 869 F.2d 1503, 1510 (D.C.Cir.1989), and although EPA maintains that its memoranda did not constitute a regulation subject to review, that is an issue for us to decide. *See American Portland Cement Alliance v. EPA*, 101 F.3d 772, 776 (D.C.Cir.1996).

The record does not provide a definitive answer to the factual question of EPA's intent. Although conceding that EPA's decision in the engineering and cost analysis memorandum to begin taking response actions at the Shelf was unobjectionable,[7] Montrose contends that the decision in the second memorandum to manage the Shelf jointly with the Montrose NPL site was an improper rulemaking intended to put the Shelf on the NPL. Montrose points to the agency's contemporaneous and subsequent actions that corroborate this conclusion and further contends that the agency is contemplating response actions that would exceed $2 million and one year and thus could only be taken with regard to listed sites. It is, however, not apparent from the record whether "joint management" necessarily entails an amendment to the NPL; the memorandum only speaks tersely to greater efficiency in terms of "administrative, funding, staffing and enforcement activities." Read most favorably to EPA, the memorandum does not seem an act of amendment so much as an act of internal agency management: a proposal for a joint administrative approach, in which a single bureaucratic structure would oversee

---

5. Chris–Craft Industries, Inc., Rhone–Poulenc Inc., Atkemix Thirty–Seven, Inc., Stauffer Management Co., Zeneca Holdings Inc., and Westinghouse Electric Corp. also sought review. Their petitions have been consolidated with Montrose's, and we refer to petitioners collectively as Montrose.

6. Montrose contends that if there was a regulation, it did not satisfy the procedural or substantive requirements for an addition to the NPL, and was arbitrary and capricious as well. Given EPA's concession that it did not follow the prop-

er procedures for amending the NPL, there is no need to address these arguments.

7. The first memorandum, notably, only proposes further investigative action for the purpose of determining what the proper future course of action would be; the memorandum even states that "EPA will compare the feasibility of [various] cleanup alternatives to the no-action option." EPA emphasizes that "[n]othing in the ... memorandum suggests that EPA was seeking to amend the NPL or otherwise engage in rulemaking."

response activities at the Shelf and EPA's ongoing activities with regard to the Montrose NPL site itself. Even if it is not entirely clear what "joint management" means, it is clear that under section 104(d)(4) the agency may treat related noncontiguous sites as one for the purpose of response activities, whether or not one or more of the sites is unlisted. *See* 42 U.S.C. § 9604(d)(4). Thus, the identification of the Shelf as the "Palos Verdes Shelf Operable Unit" of the "MONTROSE CHEMICAL CORPORATION SUPERFUND SITE," would not necessarily be as portentous as Montrose would have the court believe. Nor does the fact that EPA may now be considering response actions at the Shelf that would cost more than $2 million or last more than one year cause the court to doubt the agency's contention that the memoranda did not put the Shelf on the NPL; given the current rulemaking to list the Shelf, the agency could reasonably consider actions it may take if the Shelf is eventually properly added to the NPL.[8]

At the same time, EPA's characterizations of the Shelf's NPL status have been inconsistent, and the agency's explanation at oral argument was not completely convincing. If, as counsel asserted, EPA had considered since 1989 that the Shelf was part of the Montrose NPL site and only reevaluated that view after the decision in *Mead*, it remains unexplained why the Justice Department's letter to the Ninth Circuit indicated that the July 1996 memoranda "expand[ed]" the site and why the Department did not argue in the district court that the Shelf was part of the Montrose NPL site.

Even if EPA intended to promulgate a regulation through these memoranda, it could not, as a matter of law, have done so. In *American Portland Cement Alliance v. EPA,* the court looked at three criteria to determine whether certain "regulatory determinations" constituted regulations subject to

review: (1) the agency's own characterization of the action; (2) whether the agency published such actions in the Federal Register or the Code of Federal Regulations; and (3) whether the action had binding effects on either private parties or the agency. *See American Portland Cement Alliance,* 101 F.3d at 776; *see also McLouth Steel Prods. Corp. v. Thomas,* 838 F.2d 1317, 1320–22 (D.C.Cir.1988); *Telecommunications Research & Action Ctr. v. FCC,* 800 F.2d 1181, 1186 (D.C.Cir.1986); *Brock v. Cathedral Bluffs Shale Oil Co.,* 796 F.2d 533, 539 (D.C.Cir.1986). The two internal memoranda did not satisfy these criteria: EPA insists that the memoranda did not promulgate a valid regulation; the memoranda were never published; and the memoranda, EPA concedes, have no legally binding effect on any party. Thus, EPA cannot rely later on the memoranda to assert that the Shelf is on the NPL; lest the memoranda might be interpreted to contain an agency decision affecting the Shelf's NPL status, we vacate that decision. We are, however, unpersuaded of the need to grant Montrose's request for an injunction or declaratory judgment to the effect that EPA may not exceed the one-year and $2 million limits except on investigative work, since those limits would appear to apply by default absent some new rulemaking placing the Shelf on the NPL or some renewed and prevailing claim that the 1989 Montrose NPL listing included the Shelf. *See* 42 U.S.C. § 9604(c)(1); 40 C.F.R. §§ 300.415(b)(5), .425(b)(1). Montrose can argue this point when and if EPA in some later proceeding attempts to recover costs from the company for operations exceeding those limits. *See* 42 U.S.C. § 9607(a)(4)(A). To obtain the substantive effects of listing, EPA must adhere to CERCLA's procedures, as it appears to have recognized in initiating a rulemaking proceeding to add the Shelf to the NPL.[9]

---

8. Although EPA urges the court to stay consideration of these petitions for review in light of the ongoing rulemaking proceeding, we see no need to do so given our disposition.

9. At oral argument, counsel for EPA sought to preserve the possibility that even though the memoranda had no effect on the NPL, some

earlier, unidentified action of the agency may have had the effect of listing the Shelf. Because the petitions only sought review of the two memoranda, the question whether the Shelf is on the NPL is not before this court, only the question whether the memoranda put the Shelf there, which we answer in the negative.

Of course the need to adhere to CERCLA's substantive and procedural requirements does not mean that EPA cannot address listed and unlisted sites in a coordinated fashion. Although Montrose apparently seeks to preclude EPA from administering the Shelf in conjunction with its ongoing activities with regard to the Montrose NPL site, it makes no persuasive legal argument why EPA could not do so, as long as the agency does not take any actions with regard to the Shelf that would require NPL listing. We are not persuaded that a joint management approach need have the same substantive effects as the amendment of an NPL site. Indeed, statutory approval of the joint management approach appears implicit in section 104(d) of CERCLA, which allows EPA to treat "two or more noncontiguous facilities"—regardless of listing status—"as one for purposes of" EPA's response authority. 42 U.S.C. § 9604(d)(4). Given the potential increase in the efficiency of internal agency administration from such an approach, the court has no basis on which to declare joint management to be tantamount to amendment.

Accordingly, until EPA, pursuant to CERCLA's rulemaking procedures, properly amends the Montrose NPL site to include the Shelf, EPA cannot rely on the July 1996 memoranda to support any later claim that the Shelf is on the NPL, and because we conclude that the EPA memoranda did not constitute a "regulation" amending the NPL, we dismiss the petitions for lack of jurisdiction.