United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued November 30, 2000 Decided January 23, 2001 

 No. 99-1535

 AT&T Corporation, 
 Petitioner

 v.

 Federal Communications Commission and 
 United States of America, 
 Respondents

 Telecommunications Resellers Association, et al., 
 Intervenors

 Consolidated with 
 00-1090

 On Petitions for Review of an Order of the 
 Federal Communications Commission

 Gene C. Schaerr argued the cause for petitioner AT&T 
Corporation and supporting intervenor WorldCom, Inc. With 

him on the briefs were James P. Young, Mark C. Rosenblum, 
Peter H. Jacoby, Judy Sello, Thomas F. O'Neil, III, William 
Single, IV, and Jeffrey A. Rackow.

 William T. Lake argued the cause for petitioner US WEST 
Communications, Inc. On the briefs were Dan L. Poole, 
Robert B. McKenna, John H. Harwood, II, and William R. 
Richardson, Jr.

 John E. Ingle, Deputy Associate General Counsel, Federal 
Communications Commission, argued the cause for respon-
dents. With him on the brief were Christopher J. Wright, 
General Counsel, and Laurel R. Bergold, Counsel. Robert B. 
Nicholson and Robert J. Wiggers, Attorneys, United States 
Department of Justice, entered appearances.

 Mark C. Rosenblum, Peter H. Jacoby, Judy Sello, Gene C. 
Schaerr, James P. Young, Thomas F. O'Neil, III, William 
Single, IV, and Jeffrey A. Rackow were on the brief for 
intervenors AT&T Corporation and WorldCom, Inc.

 Before: Edwards, Chief Judge, Sentelle and Randolph, 
Circuit Judges.

 Opinion for the Court filed by Chief Judge Edwards.
 Edwards, Chief Judge: US WEST* petitioned the Federal 
Communications Commission ("FCC" or "Commission"), pur-
suant to s 10 of the Telecommunications Act of 1996, Pub. L. 
No. 104-104, 110 Stat. 56 (1996), for forbearance from "domi-
nant carrier" regulation in the provision of high capacity 
special access and dedicated transport for switched access 
services ("high capacity services") in the Phoenix and Seattle 
Metropolitan Statistical Areas ("MSAs"). See Petition of US 
WEST Communications, Inc. for Forbearance from Regula-
tion as a Dominant Carrier in the Phoenix, Arizona MSA, et 
al., 14 F.C.C.R. 19,947 (1999) (hereinafter "Forbearance Or-
der"). In seeking forbearance, US WEST relied heavily on 
evidence regarding its market share. The Commission found, 
however, that US WEST failed to provide the underlying raw 
data on which its conclusions were based, and, as a result, US 
____________
 *At the request of petitioner in 00-1090, the caption was amended to read:
"Qwest Corporation v. Federal Communications Commission and United States of
America". Although US West merged into Qwest Corporation, this court's opinion 
refers to petitioner as "US West".
WEST's findings were not verifiable. The Commission thus 
reasonably rejected US WEST's market share evidence.

 US WEST argues that the Forbearance Order should 
nevertheless be overturned, because the Commission failed to 
consider evidence of supply elasticity and demand elasticity. 
In response to US WEST's claim, the Commission held that 
market share data is critical to a "prima facie showing of 
competition." Id. p 33, at 19,967. In other words, because 
US WEST offered no reliable data on market share, the 
Commission determined that the petition for forbearance 
failed to make a prima facie showing that sufficient competi-
tion existed to satisfy the requirements of s 10. The problem 
with this position, however, is that the FCC's conclusion is 
inconsistent with its earlier decisions on this issue. In the 
past, the FCC has considered market share along with other 
factors such as supply elasticity, demand elasticity and com-
parative advantages in cost structure, size and resources. 
The FCC has even made a non-dominance determination in 
the absence of any market share data, never suggesting that 
market share data is essential for a prima facie showing of 
competition. This case must therefore be remanded for 
further consideration by the agency.

 AT&T and WorldCom, in separate petitions for review, 
argue that the Forbearance Order should be vacated to the 
extent that it grants US WEST forbearance under the Pric-
ing Flexibility Order. See In re Access Charge Reform, 14 
F.C.C.R. 14,221 (1999) (hereinafter "Pricing Flexibility Or-
der"). In p 2 of the Forbearance Order, the Commission 
stated that "we grant the relief requested in the forbearance 
petitions to the extent that the Pricing Flexibility Order 
establishes a framework pursuant to which the BOC petition-
ers may obtain relief by demonstrating satisfaction of the 
competitive triggers adopted in that order." Forbearance 
Order, 14 F.C.C.R. p 2, at 19,949. At the conclusion of the 
Order, however, the Commission explained that "the Pricing 
Flexibility Order establishes a mechanism by which the peti-
tioners may receive much of the relief they seek without 
having to demonstrate loss of market power." Id. p 36, at 
19,968. The FCC therefore "encourage[d] the BOC petition-

ers to submit [their] petitions for any market, including the 
markets identified in ... their forbearance petitions, as soon 
as they have sufficient information to satisfy the required 
competitive triggers." Id. AT&T and WorldCom claim that, 
in referring US WEST to the Pricing Flexibility Order, the 
FCC effectively granted relief on a petition that was found 
meritless under s 10. This is a specious claim. It is clear 
that, the Forbearance Order does nothing more than indicate 
that US WEST is eligible to apply for relief under the Pricing 
Flexibility Order; no concrete relief was granted to US 
WEST in the Forbearance Order.

 During argument before this court, counsel for the FCC 
suggested that the mere availability of relief under the Pric-
ing Flexibility Order was itself sufficient to forestall a claim 
under s 10. We reject this position. US WEST and other 
such petitioners are entitled to pursue forbearance under 
s 10 without regard to the Pricing Flexibility Order. In 
other words, s 10 remains a viable and independent avenue of 
appeal for pricing flexibility. Therefore, the FCC's rejection 
of the US WEST petition for forbearance does not survive 
review because of the availability of the Pricing Flexibility 
Order.

 I. Background

 US WEST petitioned the Commission to forbear from 
regulating it as a dominant carrier in high capacity services in 
the Phoenix and Seattle MSAs. Petition of US WEST Com-
munications, Inc. for Forbearance from Regulation as a Dom-
inant Carrier in the Phoenix, Arizona MSA, CC Docket No. 
98-157 (filed August 24, 1998) (hereinafter "Phoenix Pet."), at 
1; Petition of U S WEST Communications, Inc. for Forbear-
ance from Regulation as a Dominant Carrier for High Capaci-
ty Services in the Seattle, Washington MSA, CC Docket No. 
99-1 (filed Dec. 30, 1998) (hereinafter "Seattle Pet."), at iii. 
SBC Companies, Bell Atlantic Telephone Companies, and 
Ameritech Operating Companies ("BOC petitioners") also 
filed forbearance petitions seeking pricing flexibility in other 
markets throughout the United States. Forbearance Order, 

14 F.C.C.R. p 1, at 19,947-48. In seeking forbearance, US 
WEST requested permissive de-tariffing, which would permit 
the filing of tariffs on one day's notice with a presumption of 
lawfulness and without cost support, exemption from price 
cap and rate of return regulation, and permission to charge 
de-averaged rates. Phoenix Pet. at 8-9; Seattle Pet. at 8-9.

 US WEST's petition for forbearance rested on s 10 of the 
Telecommunications Act of 1996. Under s 10, the Commis-
sion will forbear from applying any regulation or any provi-
sion of the Act to a telecommunications carrier or telecommu-
nications service, or class of telecommunications carrier or 
telecommunications services, in any or some of its geographic 
markets, if the Commission determines that (1) enforcement 
of such regulation or provision is not necessary to ensure that 
the charges, practices, classifications or regulations by, for, or 
in connection with that telecommunications carrier or tele-
communications service are just and reasonable, and are not 
unjustly or unreasonably discriminatory; (2) enforcement of 
such regulation or provision is not necessary for the protec-
tion of consumers; and (3) forbearance from applying such 
provision or regulation is consistent with the public interest. 
47 U.S.C. s 160(a) (1998).

 In its petitions, US WEST argued that the high capacity 
markets in the Phoenix and Seattle MSAs were robustly 
competitive, and, as a result, US WEST did not have market 
power in those areas. US WEST based its claims primarily 
on reports prepared by Quality Strategies, POWER Engi-
neers ("PEI"), and economists Alfred E. Kahn and Timothy 
J. Tardiff. Kahn and Tardiff based their economic evaluation 
on the reports prepared by Quality Strategies and PEI, in 
addition to their own research. In describing its diminished 
market power, US WEST addressed several factors, includ-
ing (1) market participants, (2) market share, (3) demand 
elasticity of customers, (4) supply elasticity of customers, and 
(5) the carrier's cost, structure, size, and resources. Phoenix 
Pet. at 14; Seattle Pet. at 14. What follows is a brief review 
the evidence offered by US WEST.

 First, regarding market participants, US WEST claimed 
that, in the Phoenix MSA, it faced competition from resellers 
and five facilities-based competitors. US WEST emphasized 
that the merger of Teleport Communications Group, one of its 
competitors, with AT&T ("AT&T/TCG"), and the pending 
merger of MCI with another of its competitors, MFS World-
Com ("MCI/MFS WorldCom"), further contributed to robust 
competition. Phoenix Pet. at 2-3. In the Seattle MSA, US 
WEST claimed to face competition from resellers and three 
facilities-based competitors, AT&T/TCG, Electric Lightwave 
Inc., and MCI/MFS WorldCom. Seattle Pet. at 14-15.

 Second, in reference to market share, US WEST empha-
sized that, based on the market analysis conducted by Quality 
Strategies, competitors have captured more than 70% of the 
retail market for high capacity services in the Phoenix MSA. 
Phoenix Pet. at 19. In addition, competitors in the Phoenix 
MSA have captured significant portions of the growth in 
demand in the provider segment, i.e., high capacity services 
ultimately purchased by end users, and in the transport 
segment, i.e., high capacity services purchased by carriers for 
transport. Id. at 21. In the Seattle MSA, US WEST 
presented market analysis by Quality Strategies showing that 
competitors have almost 80% of the retail market for high 
capacity services. Seattle Pet. at 19. Moreover, competitors 
have captured about two-thirds of the growth in demand for 
high capacity services. Id. at iv.

 Third, in demonstrating high demand elasticity, US WEST 
pointed out that, in the Phoenix MSA, customers for high 
capacity services are sophisticated businesses, some of which 
could migrate high capacity traffic to their own affiliated fiber 
networks. Phoenix Pet. at 23-25. US WEST emphasized 
that evidence showing that competitors hold significant por-
tions of market share in the retail segment, and increasing 
portions of market share in the provider and transport seg-
ments of the market, further indicates demand elasticity. Id. 
at 25. Similarly, in the Seattle MSA, customers tend to be 
sophisticated businesses and governmental entities that are 
highly sensitive to price. Seattle Pet. at 24. In addition, as 
in the Phoenix MSA, US WEST's largest carrier customers in 

the Seattle MSA are able to migrate high capacity traffic to 
their own affiliated fiber networks. Id. at 25. Furthermore, 
Kahn and Tardiff explain that competitors' high market share 
in the retail segment of the Seattle market, and the rapid 
growth of competitors' market share in the provider and 
transport segments of the market, reinforces demand elastici-
ty. Id. at 25.

 Fourth, in relation to supply elasticity in the Phoenix MSA, 
US WEST explained that, based on Quality Strategies' mar-
ket reports, competitors have more than adequate excess 
capacity to constrain US WEST's pricing determinations. 
Phoenix Pet. at 26. US WEST's five main facilities-based 
competitors in the Phoenix MSA have put in place over 800 
route miles of optical fiber. In the Phoenix MSA, competi-
tors' fiber backbone networks would be able to assume US 
WEST's end-use and transport traffic utilizing less than 8% 
capacity. Id. at 26. Based on the PEI study of the Phoenix 
MSA, US WEST explained that if competitors invest $45 
million, they could serve almost 50% of US WEST's high 
capacity customer locations within 1,000 feet of their current 
fiber networks. Id. at 27. Kahn and Tardiff pointed out that 
economies of scale and opportunities to bundle services make 
the investment to revenue comparison more favorable to 
competitors in the Phoenix, MSA. Id. at 28-29. US WEST 
emphasized that the growth of competitors' market share in 
the Phoenix MSA demonstrates that the cost of entry is not 
prohibitive. Id. at 30.

 Similarly, in the Seattle MSA, competitors have in place 
more than 700 route miles of optical fiber, with the capacity 
to service all of US WEST's end user and transport traffic. 
Seattle Pet. at 26. An estimated 61% of US WEST's high 
capacity demand is located within 100 feet of competitors' 
networks. Id. at iv. As a result, competitors could absorb 
US WEST's services relatively quickly. Based on PEI's 
report, the cost to competitors of extending their fiber net-
works to take over most of US WEST's high capacity demand 
would not be prohibitive. If competitors invest $46 million, 
they will be able to serve the almost 60% of US WEST's high 
capacity customer locations within 1,000 feet of their existing 

fiber networks. Id. at 27. The significant growth of competi-
tors' market share demonstrates that the cost of entry is not 
prohibitive. As in the Phoenix MSA, Kahn and Tardiff 
emphasized that economies of scale and opportunities to 
bundle services make the investment to revenue ratio more 
favorable for potential competitors in the Seattle MSA. Id. 
at 28-29.

 Fifth, US WEST asserted that it did not have an advantage 
over its competitors in terms of relative size. In the Phoenix 
MSA, US WEST faces five facilities-based competitors, and 
the merged competitors AT&T/TCG and MCI/MFS World-
Com have significant advantages in terms of economies of 
scale and access to capital. Phoenix Pet. at 31. Kahn and 
Tardiff explain that the fact that competition in the market in 
the Phoenix MSA has increased, while prices for services 
have decreased, strongly indicates that investors believe in-
cumbents do not have absolute cost advantages in the market. 
Id. at 32.

 Similarly, in the Seattle MSA, US WEST does not benefit 
from comparative advantage in terms of costs, structure, size, 
and resources. As in the Phoenix MSA, AT&T/TCG and 
MCI/MFS have advantages based on size; furthermore, in-
crease in competitive entry into the market, despite the fact 
that US WEST's charges for high capacity services have 
declined, strongly indicates that US WEST does not have an 
insurmountable cost advantage. Seattle Pet. at 31-32.

 The Commission received numerous comments arguing 
that US WEST remained dominant in the markets for high 
capacity services in the Phoenix and Seattle MSAs, including 
comments criticizing Quality Strategies' market reports. 
Forbearance Order, 14 F.C.C.R. p 25, at 19,961 n.88. The 
Commission denied US WEST's request for forbearance, 
finding US WEST's basis for evidence regarding market 
share, the market analysis conducted by Quality Strategies, 
could not be verified and, therefore, was not reliable. Id. 
p p 25-26, at 19,961-62. Furthermore, the market share data 
was based on DS1 equivalents, which distorted the level of 
competition. Finally, the Commission rejected the market 

share analysis, because US WEST focused on retail market 
share and, therefore, failed to account for the fact that even 
when US WEST did not provide retail services, US WEST 
still provided and received compensation for the underlying 
facilities. Without Quality Strategies' underlying evidence of 
market share, the Commission found that US WEST had 
failed to make a prima facie showing of competition and, 
therefore, did not satisfy the initial requirement for s 10 
forbearance. Id. p 33, at 19,967.

 The Commission, however, completely failed to address the 
evidence other than the market share data offered by US 
WEST to show its diminished market power--i.e., evidence 
relating to market participants, demand elasticity of custom-
ers, supply elasticity of customers, and the carrier's cost, 
structure, size, and resources. It is this failing that is the 
focus of US WEST's petition for review.

 III. Discussion

 A. Standard of review
 
 We review the Commission's order pursuant to familiar 
Administrative Procedure Act standards, to determine wheth-
er it is arbitrary, capricious, an abuse of discretion, or not in 
accordance with law. 5 U.S.C. s 706(2)(A) (1994). As the 
Supreme Court explained in Motor Vehicle Manufacturers 
Ass'n v. State Farm Mutual Automobile Insurance Co., 463 
U.S. 29 (1983):

 The scope of review under the "arbitrary and capricious" 
 standard is narrow and a court is not to substitute its 
 judgment for that of the agency. Nevertheless, the 
 agency must examine the relevant data and articulate a 
 satisfactory explanation for its action including a "ration-
 al connection between the facts found and the choice 
 made." Burlington Truck Lines, Inc. v. United States, 
 371 U.S. 156, 168 (1962). In reviewing that explanation, 
 we must "consider whether the decision was based on a 
 consideration of the relevant factors and whether there 
 has been a clear error of judgment." Bowman Trans-
 portation, Inc. v. Arkansas-Best Freight System, Inc., 
 
 supra, at 285; Citizens to Preserve Overton Park v. 
 Volpe, supra, at 416. Normally, an agency rule would be 
 arbitrary and capricious if the agency has relied on 
 factors which Congress has not intended it to consider, 
 entirely failed to consider an important aspect of the 
 problem, offered an explanation for its decision that runs 
 counter to the evidence before the agency, or is so 
 implausible that it could not be ascribed to a difference in 
 view or the product of agency expertise. The reviewing 
 court should not attempt itself to make up for such 
 deficiencies; we may not supply a reasoned basis for the 
 agency's action that the agency itself has not given. 
 SEC v. Chenery Corp., 332 U.S. 194, 196 (1947).
 
Id. at 43. In addition, the Court has made it clear that when 
an agency determines to change an existing regulatory re-
gime it must do so on the basis of "reasoned analysis." Id. at 
42.

 B. Commission's Denial of Forbearance
 
 The Commission determined that it was not required to 
forbear from treating US WEST as a dominant carrier solely 
because of three major areas of weakness in US WEST's 
evidence regarding market share. The Commission's princi-
pal concern appeared to be that the studies conducted by 
Quality Strategies analyzing US WEST's market share were 
not reliable. US WEST did not provide the underlying raw 
data on which the studies were based. As a result, the 
analysis could not be evaluated or verified. The Commission 
noted, for example, that Quality Strategies failed to provide a 
copy of the questions and answers that were the basis of its 
surveys, and failed to describe how it weighted and evaluated 
responses to the surveys. Forbearance Order, 14 F.C.C.R. 
p 25, at 19,961. Without adequate information about Quality 
Strategies' methods, the Commission found that it was unable 
to resolve discrepancies between their market share evidence 
and evidence presented by other commentators. Id. p 26, at 
19,962.

 The Commission also faulted the material prepared by 
Quality Strategies insofar as it purported to measure market 
share by analyzing the percentage of capacity provided by 
various providers of high capacity services. A "DS1" is a 
measure of capacity, and Quality Strategies used DS1 equiva-
lents to measure market share. The problem, however, as 
the FCC pointed out, is that reliance on DS1 equivalents fails 
to provide an accurate measure of competition for high capac-
ity services, because resort to this data overstates competitive 
inroads in a market. One DS3 channel is equivalent to 28 
DS1 channels. Therefore, if entity "x" provides one DS3 
channel to one customer, and entity "y" provides 28 DS1 
channels to 28 different customers, entity "y" can claim that it 
has only 50% of the market share based on "capacity." Id. 
p 27, at 19,963. Because of this type of distortion, the Com-
mission rejected the claim that the DS1 equivalents methodol-
ogy provides an accurate measure of market share. The 
Commission also found that DS1 equivalents methodology 
puts disproportionate weight on entrance facilities, which are 
usually DS3 circuits. Id. p 28, at 19,964.

 Finally, the Commission found that US WEST's evidence 
regarding market share further distorts levels of competition 
by relying on retail market share. By defining competitive 
losses based on retail, US WEST can claim competitive losses 
even when US WEST provides the underlying facilities and, 
therefore, continues to benefit from a substantial revenue 
stream from the services. Id. p 29, at 19,965. For example, 
the Commission noted that US WEST claimed to have lost 
70% of the Phoenix retail market for special access and high 
capacity dedicated transport services. But, according to its 
own calculations, US WEST maintained control over 77% of 
the overall Phoenix market for special access and high capaci-
ty dedicated transport. Id. US WEST argues that the FCC 
considered only market share and failed to analyze other 
bases of market power, including evidence regarding supply 
elasticity, demand elasticity, and the comparative resources of 
US WEST and its competitors. They are right on this point. 
The FCC's order rests solely on a view that, because US 
WEST offered no reliable data on market share, the petition 

for forbearance failed to make a prima facie showing that 
sufficient competition existed to satisfy the requirements of 
s 10. Insofar as there may be other reasons to reject US 
West's petition, such as the purported deficiencies in US 
West's elasticity arguments outlined in the FCC's brief, they 
were not articulated in the FCC's order and, therefore, 
cannot provide the basis for upholding the FCC's decision. 
See Burlington Truck Lines v. United States, 371 U.S. 156, 
168-69 (1962) ("the courts may not accept appellate counsel's 
post hoc rationalizations for agency action; Chenery requires 
that an agency's discretionary order be upheld, if at all, on 
the same basis articulated in the order by the agency itself" 
(citing SEC v. Chenery, 332 U.S. 194, 196 (1947)).

 Were this the first time the FCC was asked to consider 
whether a carrier was dominant in a given market, the 
explanation provided by the Commission in the Forbearance 
Order may well have been adequate; but it is not the first 
time that the Commission has addressed this issue. Indeed, 
the FCC has considered this question on several occasions, 
each time applying a test different from that applied here to 
determine whether the firm in question retained market 
power. For instance, in the Motion of AT&T Corp. to be 
Reclassified as a Non-Dominant Carrier, 11 F.C.C.R. 3,271 
(1995) the FCC considered four factors: (1) "AT&T's market 
share"; (2) "the supply elasticity of the market"; (3) "the 
demand elasticity of AT&T's customers"; and (4) "AT&T's 
cost structure, size and resources." Id. p 38, at 3,293-94. 
This approach was also followed in subsequent proceedings 
before the agency. See Motion of AT&T Corp. to be De-
clared Non-Dominant for International Service, 11 F.C.C.R. 
p 36 at 17,977 (1996) ("AT&T International Nondominance 
Order"); COMSAT Corp., Petition Pursuant to Section 10(c) 
of the Communications Act of 1934, as amended, for Forbear-
ance from Dominant Carrier Regulation and for Reclassifi-
cation as a Non-Dominant Carrier, 13 F.C.C.R. p 67, at 
14,118-19 (1998) ("COMSAT Nondominance Order"). Yet, in 
evaluating US West's petition, the FCC ended its inquiry 
once it deemed the market share data inadequate.

 Logically, for the lack of market share data to establish the 
lack of a prima facie case, market share must be an essential 
factor, not merely one of several factors in the determination. 
Our research indicates, however, that the FCC has never 
viewed market share as an essential factor in the past, and 
the Commission does not assert to the contrary. In fact, the 
FCC acknowledges that "the factors the Commission tradi-
tionally considered in classifying carriers as dominant or non-
dominant include market share, supply substitutability, elas-
ticity of demand, and the cost structure, size and resources of 
the carrier." FCC Br. at 4. Therefore, the FCC's conclusion 
in the Forbearance Order that market share data is essential 
for a prima facie showing of competition simply is not 
consistent with the agency's earlier decisions.

 It is also noteworthy that, in the past, the FCC has gone so 
far as to view market share as irrelevant where there was 
other evidence that a carrier lacked market power. In the 
COMSAT Nondominance Order, for example, the FCC made 
a nondominance finding without "specific data" on the market 
shares of the carrier in question or its competitors. 
COMSAT Nondominance Order, 13 F.C.C.R. p 111, at 14,139.

 It may be that it is reasonable for the Commission to 
demand a showing on market share in every dominance 
inquiry. But, no matter how reasonable it may be for the 
FCC to require market share data before evaluating an 
incumbent local exchange carrier's market power, it is not 
reasonable for the Commission to announce such a policy 
without providing a satisfactory explanation for embarking on 
this course when it has not followed such a policy in the past. 
The FCC "cannot silently depart from previous policies or 
ignore precedent" as it has done here. Committee for Com-
munity Access v. FCC, 737 F.2d 74, 77 (D.C. Cir. 1984) (citing 
Greater Boston Television Corp. v. FCC, 444 F.2d 841, 852 
(D.C. Cir. 1970) ("an agency changing its course must supply 
a reasoned analysis indicating that prior policies and stan-
dards are being deliberately changed, not casually ignored")). 
No matter how reasonable the FCC's position that market 
share data is necessary for a prima facie showing of market 
competition, the FCC's "conclusory statements cannot substi-

tute for the reasoned explanation that is wanting in this 
decision." Arco Oil & Gas Co. v. FERC, 932 F.2d 1501, 1504 
(D.C. Cir. 1991).

 Accordingly, the FCC's Forbearance Order must be re-
manded so that the Commission may "examine the relevant 
data and articulate a satisfactory explanation for its action." 
Motor Vehicle Manufacturers Ass'n, 463 U.S. at 43. The 
FCC departed from its traditional non-dominance analysis 
without explanation. The FCC's new policy that market 
share data is essential to evaluate a carrier's market power 
may well be reasonable, but until the Commission has ade-
quately explained the basis for this conclusion, it has not 
discharged its statutory obligation under the Administrative 
Procedure Act. Where, as here, an agency "has failed ... to 
explain the path that it has taken, we have no choice but to 
remand for a reasoned explanation." Tex Tin Corp. v. EPA, 
935 F.2d 1321, 1324 (D.C. Cir. 1991).

 C. Alleged Grant of Forbearance Under the Pricing Flexi-
 bility Order
 
 In the Forbearance Order, the Commission stated that "we 
grant the relief requested in the forbearance petitions to the 
extent that the Pricing Flexibility Order establishes a frame-
work pursuant to which the BOC petitioners may obtain relief 
by demonstrating satisfaction of the competitive triggers 
adopted in that order." Forbearance Order, 14 F.C.C.R. p 2, 
at 19,949. AT&T and WorldCom argue that the Forbearance 
Order should be vacated to the extent that the Commission 
"granted" "relief" to US WEST, because US WEST's petition 
was found to be meritless under s 10. This argument bor-
ders on being disingenuous.

 When the Forbearance Order is read in its entirely, it is 
absolutely clear that US WEST was granted no relief whatso-
ever. US WEST sought forbearance and it was categorically 
denied. At the conclusion of the Order, the Commission 
reminded US WEST and other BOCs that they were eligible 
to apply for pricing flexibility under the Pricing Flexibility 
Order:

 The BOC petitioners may file petitions with the Commis-
 sion in accordance with the procedures outlined in the 
 Pricing Flexibility Order for any market, including the 
 markets identified in their forbearance petitions, identify-
 ing the relief requested and demonstrating satisfaction of 
 the triggers adopted therein.
 
Id. p 2, at 19,949. Indeed, the FCC was quite candid in 
suggesting that the Pricing Flexibility Order might be the 
preferred mechanism for companies seeking relief from the 
burdens of dominant carrier status, because "price cap LECs 
are not required to demonstrate that they lack market power 
in the provision of any access service to receive much, if not 
all, of the pricing flexibility that the BOC petitioners seek in 
their forbearance requests." Id. p 11, at 19,953. The For-
bearance Order does not, however, ensure US WEST any 
kind of entitlement to the regulatory relief available under 
either s 10 of the Act or the recently promulgated Pricing 
Flexibility Order. Accordingly, the claims from AT&T and 
WorldCom are specious.

 D. Impact of Pricing Flexibility Order on s 10 Forbear-
 ance
 
 During oral argument, it became clear that there is some 
confusion over the relationship between the mechanisms for 
relief afforded by s 10 forbearance and the Pricing Flexibility 
Order. FCC counsel went so far as to suggest that the latter 
preempts the former. We reject this view.

 There is no doubt that the Commission expressed great 
enthusiasm over the availability of the Pricing Flexibility 
Order as a mechanism for relief of the sort sought here by 
US WEST and other BOCs. Indeed, the Commission sug-
gested that might be a better mechanism for affected compa-
nies, because

 non-dominance showings [under s 10] are neither admin-
 istratively simple nor easily verifiable. The Commission 
 [bases] non-dominance findings on complex criteria, in-
 cluding market share and supply elasticity. Market 
 
 share analyses require considerable time and expense, 
 and they generate controversy that is difficult to resolve.
 
Id. p 11, at 19,953. The Commission may or may not be right 
in what it surmises about the purported advantages of the 
Pricing Flexibility Order; but, at least for now, these surmis-
es are beside the point. Congress has established s 10 as a 
viable and independent means of seeking forbearance. The 
Commission has no authority to sweep it away by mere 
reference to another, very different, regulatory mechanism.

 Section 10 broadly states that the Commission will forbear 
from applying any regulation or any provision of the Act to a 
telecommunications carrier or telecommunications service, or 
class of telecommunications carrier or telecommunications 
services if certain statutory determinations are made. 47 
U.S.C. s 160. The Pricing Flexibility Order does not purport 
to regulate pursuant to s 10--it is narrower in reach and 
adopts different burdens of proof with respect to issues that 
might be common to claims arising under s 10 or the Pricing 
Flexibility Order. And, notably, in the Forbearance Order, 
the Commission did not claim that the Pricing Flexibility 
Order would afford all of the relief otherwise available to a 
petitioner under s 10; rather, the Commission said only that 
"the Pricing Flexibility Order establishes a mechanism by 
which the petitioners may receive much [not all] of the relief 
they seek" under s 10. 14 F.C.C.R. p 36, at 19,968.

 In short, the availability of the Pricing Flexibility Order as 
an alternative route for seeking pricing flexibility does not 
diminish the Commission's responsibility to fully consider 
petitions under s 10. Therefore, the Commission is without 
authority to deny US WEST's petition for forbearance be-
cause of the availability of the Pricing Flexibility Order.

 IV. Conclusion

 For the foregoing reasons, US WEST's petition for review 
is granted and the case is remanded for further consideration 
by the agency. The petition for review filed by AT&T and 
WorldCom is hereby denied.